Filed 4/30/21  P. v. Aguilar CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H046279 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1885976) |
| v. | |
| SAUL VARGAS AGUILAR et al., | |
| Defendants and Appellants. | |

Defendants Saul Vargas Aguilar and Alonzo Jimenez appeal after a jury convicted them both of being a prohibited person in possession of a firearm (Pen. Code, § 29800, subd. (a)(1)[1]), carrying a loaded firearm (§ 25850, subd. (a)), and actively participating in a criminal street gang (§ 186.22, subd. (a)).  The jury found true allegations that the firearm offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).  The trial court found true a prior prison term allegation (§ 667.5, subd. (b)) as to defendant Aguilar and a strike allegation (§§ 667, subds. (b)-(i), 1170.12) as to defendant Jimenez, which was based on a prior juvenile adjudication.

The trial court sentenced defendant Aguilar to an aggregate prison term of six years, and it sentenced defendant Jimenez to an aggregate prison term of four years eight months.

---

[1] Unspecified section references are to the Penal Code.

On appeal, defendants challenge the sufficiency of the evidence supporting the gang allegations and the gang crime, on several grounds. They assert that the prosecution failed to prove the Norteños were a criminal street gang under *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*); that there was insufficient evidence of the Norteño gang's primary activities; that there was insufficient evidence defendants intended to benefit the Norteño gang; and that there was insufficient evidence of active participation, knowledge of a pattern of criminal gang activity, and promotion of felonious criminal conduct.[2] Defendants also challenge the instruction on active participation in a criminal street gang (CALCRIM No. 1400).

Defendant Aguilar contends his trial counsel was ineffective for failing to object to testimony about a statement defendant Jimenez made during his gang registration. Both defendants contend they received ineffective assistance of counsel because their trial attorneys did not object when the gang expert testified that certain violent crimes were among the Norteño gang's primary activities, nor to a jury instruction that referred to those same violent crimes.

Defendant Aguilar contends there was cumulative prejudice.

Defendant Jimenez contends that the true finding on his strike must be reversed because he had no right to a jury trial in the underlying juvenile proceedings, and defendant Aguilar contends that the one-year term for his prior prison term enhancement must be stricken due to subsequent amendments to section 667.5, subdivision (b).

Both defendants contend that the trial court erroneously imposed a $500 restitution fine and $339.75 in fees without finding they each had an ability to pay.

As we shall explain, we find substantial evidence supports both defendants' convictions, and we find no ineffective assistance of counsel; we therefore find no cumulative prejudice. We find no grounds for reversing the strike finding as to defendant

---

[2] Defendants join most of each other's arguments.

Jimenez, and we decline to remand for an ability to pay hearing as to the fees and fines, but we agree with defendant Aguilar that his prior prison term enhancement must be stricken. We will therefore affirm the judgment as to defendant Jimenez, but we will reverse the judgment as to defendant Aguilar and remand his matter for resentencing.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   *March 5, 2018 Incident*

On the night of March 5, 2018, San Jose Police Officer Jared Yuen was on patrol with his partner, Officer Hector Gonzalez. They were in the area of King Road and Tully Road, which is "one of the most prominent gang and problem areas in the city."

Officers Yuen and Gonzalez noticed a vehicle with two Vehicle Code violations: all four of its windows were tinted, and one of its reverse lights was not working. The vehicle was a blue Honda Civic with two occupants.

The officers followed the Honda as it went north on King Road, using their patrol car's lights and sirens to initiate a stop. The Honda slowed down to five or 10 miles per hour, but it did not pull over. The Honda then pulled into a supermarket parking lot, where it continued past open parking stalls before rolling to a stop. As the Honda stopped, the front passenger—defendant Aguilar—got out and began running.

Officer Yuen pursued defendant Aguilar while Officer Gonzalez stayed with the driver—defendant Jimenez. Officer Yuen could see that defendant Aguilar had a red bandana in his back pants pocket. Officer Yuen caught up with defendant Aguilar, struck defendant Aguilar with his baton, then handcuffed him.

Another officer arrived and searched defendant Aguilar, finding a fully loaded silver .357 revolver in defendant Aguilar's front pocket. The firearm was registered to a person named Mary Miller.

3

At the time of the incident, both defendants were prohibited from possessing firearms.[3]

## B.    *Gang Evidence*

### 1.    *Gang Expert Testimony: the Norteño Gang*

San Jose Police Detective Justin Jantz had received training on gangs, including Norteño gangs. He had participated in at least 300 gang investigations, many of which involved Norteño gangs. He had spoken with several hundred Norteño gang members. He had discussed gang trends with other officers in his department and with officers at other agencies.

In San Jose, there are several thousand members of the Norteño criminal street gang. The Norteño gang began in the 1960's, as members of the Nuestra Familia prison gang were released from custody.

Norteño gang members sometimes call themselves Northerners. The number 14 is significant for Norteños because N is the fourteenth letter of the alphabet. Other common Norteño gang signs and symbols include the huelga bird; XIV, which is the Roman numeral for the number 14; X4, which is a mix of a Roman numeral and a standard numeral; tattoos with one dot and four dots; and the color red.

The Norteño gang has "smaller hoods or gangs" called "subsets." In San Jose, the subsets include El Hoyo Palmas, West Side Mob, and San Carlos Boys. However, one does not need to be a member of a subset in order to be a member of the Norteño gang. "People claim Norteño all the time and don't have subsets."

The Norteño gang has "a general hierarchy," but not a "direct structure." Rather, Norteños "take their overall cues and pay their dues" to the Nuestra Familia prison gang.

The area of King Road and Tully Road is a Norteño territory. The area is controlled by the Varrio Meadowfair subset.

---

[3] Outside the presence of the jury, defendants Aguilar and Jimenez both admitted prior felony convictions.

Sureños are the main rivals of Norteños. Sureños represent themselves with the number 13, the color blue, and the letter M.

Weapons are valuable to gang members because they provide control, respect, and intimidation. Weapons assist gang members in protecting their territory and committing crimes. Firearms are the most valuable weapon. A gang member with a firearm will be "looked at with a little bit more respect." Gang members often share guns. The guns are not usually registered to a gang member, so there will be no connection between a gun and a crime committed with that gun. Gang members will protect their guns because of their value.

The primary activities of the Norteño criminal street gang are murder, attempted murder, assault with a deadly weapon, carjacking, illegal firearm possession, possession of a concealed firearm, and kidnapping.

2.    *Predicate Offense Evidence*

In November 2013, Miguel Angel Ortega was convicted of possession of a concealed firearm (§ 25400). In September 2015, Ortega admitted that he was a "Northerner." Ortega's gang registration referred to "East Side San Jose," which is "an area of the city," not a gang subset.

In April 2016, Alejandro Ariza was convicted of possession of a concealed firearm (§ 25400). In September 2016, Ariza admitted that he was a "Northerner." When asked who he "kick[s] it with," Ariza referred to "Mob" or "Hog," which are subsets of the Norteño gang.

Detective Jantz believed that Ortega was a Norteño based on photographs of Ortega's gang tattoos, Ortega's admission to being a Northerner, and Detective Jantz's conversations with other officers. Detective Jantz believed that Ariza was a Norteño based on photographs of Ariza's gang tattoos, Ariza's admission to being a Northerner, and Ariza's gang registration. Detective Jantz did not believe that either Ortega or Ariza

5

was a member of a subset. He believed they were both "general Norteños with no allegiance to a subset."

In February 2016, defendant Jimenez was convicted of possession of a concealed firearm (§ 25400). In September 2017, a gang detective registered defendant Jimenez. Defendant Jimenez said he was a Norteño. Defendant Jimenez's tattoos included four dots underneath his left eye and "X4" across his chest. Defendant Jimenez denied belonging to a subset.

In March 2017, defendant Aguilar was convicted of being a prohibited person in possession of a firearm (§ 29800). When meeting with his probation officer during the two years prior to trial, defendant Aguilar would sometimes be dressed in what appeared to be Norteño gang attire: his clothing included an oversized red t-shirt, a Sharks cap, and a red belt. Also during that time period, defendant Aguilar had obtained tattoos that appeared to be gang-related: the word "San" on one forearm, the word "Jo" on another forearm, and the number 14 on his neck. Defendant Aguilar, however, told his probation officer he was not a gang member.

### 3. Gang Expert Testimony: Opinions

Detective Jantz believed defendant Jimenez was a member of the Norteño criminal street gang. That opinion was based on defendant Jimenez's tattoos, defendant Jimenez's gang registration interview, and the facts of the present case. Detective Jantz explained that having the one dot and four dot tattoos on his face was indicative of defendant Jimenez being an active gang member, because the face is "not easily hidden."

Detective Jantz believed defendant Aguilar was also a member of the Norteño criminal street gang. That opinion was based on defendant Aguilar's tattoos, the opinion of another gang detective, the bandana he had at the time of his arrest, his association with defendant Jimenez, and the facts of the present case.

Detective Jantz explained that his opinions were not affected by the fact that defendants were in an area controlled by the Varrio Meadowfair subset. He explained

6

that a gang member does not "actually have to be a member of a subset" to hang out in the subset's territory, as long as the gang member is "on good terms with that subset at the time."

A hypothetical was provided to Detective Jantz that mirrored the facts of this case. Detective Jantz opined that the unlawful firearm possession would benefit and be committed in association with a criminal street gang. He explained, "The two gang members are in association with one another at the time, and . . . they're trying to keep that firearm in their possession . . . . [T]hey're working together to make sure that firearm stays away from the police . . . ." The benefit to the gang would come from "keeping possession of that firearm," because the firearm would "help to further their endeavors in the future." Losing the firearm would also cause other gang members to lose respect for the person entrusted with the firearm.

## C.    *Verdicts and Sentencing*

The jury convicted both defendants of being a prohibited person in possession of a firearm (§ 29800, subd. (a)(1)), carrying a loaded firearm (§ 25850, subd. (a)), and actively participating in a criminal street gang (§ 186.22, subd. (a)). The jury found true gang allegations (§ 186.22, subd. (b)(1)) as to both defendants' firearm counts.

The trial court found true a prior prison term allegation as to defendant Aguilar and a strike allegation as to defendant Jimenez.

The trial court sentenced defendant Aguilar to an aggregate prison term of six years, comprised of the two-year midterm for the violation of section 29800; a consecutive three-year term for the gang allegation; and a consecutive one-year term for the prior prison term allegation. The trial court stayed the term for the violations of sections 25850 and 186.22, subdivision (a) pursuant to section 654.[4]

---

[4] The abstract of judgment incorrectly reflects imposition of a concurrent term for the violation of section 186.22, subdivision (a). As we are remanding for resentencing as to defendant Aguilar, the trial court will have an opportunity to correct this error.

7

The trial court sentenced defendant Jimenez to an aggregate prison term of four years eight months, comprised of the low term of 16 months for the violation of section 29800, doubled to two years eight months due to the strike allegation; and a consecutive two-year term for the gang allegation. The trial court stayed the terms for the violations of sections 25850 and 186.22, subdivision (a) pursuant to section 654.

## II. DISCUSSION

### A. *Sufficiency of the Evidence Claims*

Defendants challenge the sufficiency of the evidence supporting both the gang allegation (§ 186.22, subd. (b)(1)) and the substantive gang offense (§ 186.22, subd. (a)), in several respects.

### 1. *Standard of Review*

When considering a challenge to the sufficiency of the evidence to support a criminal conviction, we "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 319-320.) "In making this determination, we do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses." (*People v. Cortes* (1999) 71 Cal.App.4th 62, 71 (*Cortes*).)

### 2. *Gang Organization*

Defendants contend there was insufficient evidence to support the gang allegation and substantive gang offense based on *Prunty*, *supra*, 62 Cal.4th 59, which requires the prosecution prove that members of the same "ongoing organization, association, or group" (§ 186.22, subd. (f)) committed the predicate offenses and the charged offense, and that the same gang benefitted from the charged offense.

8

Section 186.22, subdivision (f) defines a criminal street gang as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of [certain enumerated] criminal acts . . . , having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity."

In *Prunty*, the California Supreme Court addressed "what type of showing the prosecution must make when its theory of why a criminal street gang exists turns on the conduct of one or more gang subsets." (*Prunty*, *supra*, 62 Cal.4th at p. 67.) The court reviewed the definition of "criminal street gang" in section 186.22, subdivision (f) and determined that "where the prosecution's case positing the existence of a single 'criminal street gang' . . . turns on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets." (*Prunty*, *supra*, at p. 71.)

Defendants contend that *Prunty* requires demonstration of an organizational or associational connection among gang subsets. "The *Prunty* court, however, specifically declined to hold that a broader 'umbrella' group such as the Norteños or Sureños could not constitute a criminal street gang under section 186.22." (*People v. Pettie* (2017) 16 Cal.App.5th 23, 49 (*Pettie*).)

*Prunty* explained that its rule applies only "where the prosecution's theory of why a criminal street gang exists turns on the conduct of one or more gang subsets, not simply to those in which the prosecution alleges the existence of 'a broader umbrella gang.' " (*Prunty*, *supra*, 62 Cal.4th at p. 71, fn. 2.)

In *Prunty*, the evidence showed that the defendant identified as a Norteño and claimed membership in a Norteño subset, the Detroit Boulevard Norteños. (*Prunty*, *supra*, 62 Cal.4th at pp. 67-68.) The gang expert in that case testified about predicate offenses committed by members of two other subsets: the Varrio Gardenland Norteños

9

and the Varrio Centro Norteños.  (*Id*. at p. 69.)  The prosecution did not introduce evidence that either of the two subsets identified with a larger Norteño group, nor any evidence that those subsets shared a connection with each other or with any other Norteño-identified subset.  (*Ibid*.; see *People v. Nicholes* (2016) 246 Cal.App.4th 836, 845-846 [evidence of primary activities and predicate offenses related to Norteño subsets with no connection to the defendant's subset].)

In contrast to *Prunty*, here the prosecution presented evidence of two predicate offenses committed by "general Norteños with no allegiance to a subset."  The prosecution's theory was that the shooting was committed in association with and for the benefit of the Norteño gang.  The gang expert testified that defendants were Norteño gang members and not members of any subset.  *Prunty* is inapplicable to these facts.

Defendants challenge the expert's testimony about Ortega and Ariza being "general Norteños with no allegiance to a subset."  They point out that during his gang registration, Ariza claimed to "kick[] it with" the Norteño subsets "Mob" or "Hog."  They note that Ortega's gang registration referred to "East Side San Jose," and that despite the gang expert's claim that "East Side San Jose" is "an area of the city," not a gang subset, expert testimony in another case identified "Eastside San Jose" as "a 'gang designated area' of San Jose."  (See *Pettie*, *supra*, 16 Cal.App.5th at p. 37.)  However, it was the jury's job to weigh any conflicting evidence, including that presented by the gang expert.  (See *Cortes*, *supra*, 71 Cal.App.4th at p. 71; *People v. Flores* (2006) 144 Cal.App.4th 625, 633 [jury is to determine credibility and weight of expert testimony].)  Here, the jury could reasonably believe the gang expert when he testified that Ortega and Ariza were "general Norteños" who were not members of any subsets.

3.      *Primary Activities*

Defendants contend the prosecution presented insufficient evidence of the "primary activities" element of section 186.22, subdivision (f).  Defendants specifically argue that there was no "factual foundation" for the gang expert's testimony about the

10

primary activities of the Norteño gang. Defendants note that the gang expert did not provide the details of any crimes nor specify whether his opinion was based on "highly reliable sources, such as court records of convictions, or entirely unreliable hearsay."

"The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.) The *Sengpadychith* court explained that expert testimony can be sufficient in this regard, such as in *People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*).[5] "There, a police gang expert testified that the gang of which defendant Gardeley had for nine years been a member was primarily engaged in the sale of narcotics and witness intimidation, both statutorily enumerated felonies. [Citation.] The gang expert based his opinion on conversations he had with Gardeley and fellow gang members, and on 'his personal investigations of hundreds of crimes committed by gang members,' together with information from colleagues in his own police department and other law enforcement agencies." (*Sengpadychith*, *supra*, at p. 324.)

Defendants compare this case to *In re Alexander L.* (2007) 149 Cal.App.4th 605. In that case, the gang expert "did not directly testify that criminal activities constituted [the gang's] primary activities." (*Id.* at p. 612.) Further, the gang expert in that case did not explain the basis for his opinion: he did not, for instance, state that the opinion was based on conversations with gang members, investigation of other gang crimes, and information from other law enforcement officers. (*Id.* at p. 613; compare *Gardeley*, *supra*, 14 Cal.4th at p. 620.)

In this case, the gang expert directly testified that the primary activities of the Norteño criminal street gang are murder, attempted murder, assault with a deadly weapon, carjacking, illegal firearm possession, possession of a concealed firearm, and

---

[5] *Gardeley* was disapproved on other grounds by *People v. Sanchez* (2016) 63 Cal.4th 665, 686, footnote 13.

11

kidnapping. And significantly, the gang expert testified that the basis for his expertise regarding the Norteño gang included his training on gangs, his participation in hundreds of prior Norteño gang investigations, his discussions with hundreds of Norteño gang members, and his discussions with other law enforcement officers. Under *Gardeley* and *Sengpadychith*, this was sufficient evidence of the primary activities element.

       *4.     Gang Enhancement–Benefit and Specific Intent*

       Defendants contend there was insufficient evidence to support a finding that they committed the firearm offenses "for the benefit of, at the direction of, or in association with any criminal street gang" and "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).)

       Defendants assert the instant case is similar to *People v. Ramon* (2009) 175 Cal.App.4th 843, in which the court found insufficient evidence that the defendant's crimes—possession of a stolen vehicle and various firearm possession offenses—were committed for the benefit of, or with the specific intent to promote, a criminal street gang. In *Ramon*, police found the defendant driving a stolen vehicle, and they found a handgun under the driver's seat. (*Id*. at p. 847.) The defendant and his passenger were gang members. A gang expert testified that a stolen vehicle and a firearm could help a gang commit other crimes. On appeal, the *Ramon* court found that the expert opinion was improper because it was speculative to conclude that the defendant and his passenger were acting on behalf of their gang at the time of their arrest. (*Id*. at p. 851.) The court noted that its "analysis might be different if the expert's opinion had included 'possessing stolen vehicles' as one of the activities of the gang." (*Id*. at p. 853.)

       " 'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the Penal Code section 186.22, subdivision (b)(1), gang enhancement." (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.) In the instant case, the expert testimony supplied the type of information missing in *Ramon*. Here, there was expert testimony that "illegal firearm possession" and

"possession of a concealed firearm" were among the primary activities of the Norteño gang. In addition, here defendants attempted to avoid police detection of the firearm, which supplied a factual basis for the expert's opinion that it would benefit the gang if the firearm was not found or confiscated. The firearm in this case was also not registered to either defendant, which supplied a factual basis for the expert's opinion that the gang would benefit from having a gun that could not be easily connected to the person who used it. This evidence also supported a finding that defendants had the "specific intent to promote, further, or assist in any criminal conduct by gang members" (§ 186.22, subd. (b)(1)), as a jury could reasonably find that by attempting to prevent the firearm from being found and confiscated by the police, defendants intended to promote, further, or assist the gang in its primary activities, which included firearm possession offenses.

Defendants assert that the gang expert in this case testified, in response to a hypothetical mirroring the facts of this case, that the firearm offenses would benefit only the two defendants—in other words, not the entire gang. Defendants point to the gang expert's testimony that possessing the firearm would benefit "the two of them that are together." However, just prior to that testimony, the gang expert specified that it was his opinion that the crime would benefit and be in association with a criminal street gang. He explained how firearms were very important to gangs, that firearms are typically passed around among gang members, and how "other members" of the gang would lose respect for a gang member who lost the firearm.

In sum, substantial evidence supports the jury's finding that defendants committed the firearm offenses "for the benefit of, at the direction of, or in association with any criminal street gang" and "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).)

13

5.   *Gang Crime—Active Participation, Knowledge, and Promotion of Felonious Criminal Conduct*

Defendants contend their convictions of the substantive gang offense must be reversed because there is insufficient evidence they "actively participate[d]" in a criminal street gang, had "knowledge that [the gang's] members engage in, or have engaged in, a pattern of criminal gang activity," and "willfully promote[d], further[ed], or assist[ed] in any felonious criminal conduct by members of that gang." (§ 186.22, subd. (a).)

i.   Active Participation

"[A]ctive participation in a criminal street gang" means "participation that is more than nominal or passive." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130 (*Rodriguez*).) Sufficient evidence of active participation has been found where the defendant has visible gang tattoos, the defendant admits gang membership and has a gang moniker, the defendant commits a crime that is one of the gang's primary activities, and the defendant's crime is committed in association with another gang member. (See *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1331.)

Here, defendants both had visible Norteño gang tattoos. Defendant Jimenez admitted he was a Norteño. Defendant Aguilar dressed in what appeared to be Norteño gang attire during his probation interviews, and he carried a red bandana at the time of the charged offenses. Defendants committed firearm offenses that were among the Norteño gang's primary activities, and they did so in association with one another. This evidence was sufficient to support the jury's finding that they were both active participants in a criminal street gang.

ii.   Knowledge

"[J]ust as a jury may rely on evidence about a defendant's personal conduct, as well as expert testimony about gang culture and habits, to make findings concerning a defendant's active participation in a gang or a pattern of gang activity, it may also rely on

14

the same evidence to infer a defendant's knowledge of those activities." (*People v. Carr* (2010) 190 Cal.App.4th 475, 489.)

Here, the jury could infer that defendants were aware of their own actions in feloniously possessing and concealing the loaded firearm that was not registered to either of them. The jury could also infer that defendants were aware of their own prior convictions for illegal firearms possession. In addition, the jury could consider the evidence of defendants' Norteño gang membership along with the expert testimony about the primary activities of the Norteño gang, and reasonably find that both defendants had the requisite knowledge that the gang's members engage in, or have engaged in, a pattern of criminal gang activity.

### iii. Furthering Felonious Criminal Conduct by a Gang

Section 186.22, subdivision (a)'s requirement that a defendant "willfully promote[], further[], or assist[] in any felonious criminal conduct by members of *that gang*" (italics added) means that a person must "commit an underlying felony with at least one other gang member." (*Rodriguez*, *supra*, 55 Cal.4th at p. 1134.)

Defendants reassert their *Prunty* argument: that the evidence failed to establish that the Norteño gang met the elements of section 186.22, subdivision (f). However, as we have previously concluded, there was substantial evidence to support a finding that the Norteños are a criminal street gang and that both defendants were Norteño gang members when they committed the charged offenses. Thus, the record contains sufficient evidence of this element of the substantive gang offense.

## B. *Jury Instruction Claim*

Defendants challenge CALCRIM No. 1400, the instruction on active participation in a criminal street gang, as "internally contradictory." They assert that the instruction told the jury that "at least two members of the same gang must have participated in committing the felony offense" while also stating that the prosecution did not have to prove that a defendant "was an actual member of the gang."

15

As given, the instruction provided in pertinent part: "[E]ach defendant is charged in Count 4 with participating in a criminal street gang, in violation of Penal Code Section 186.22(a). To prove that a defendant is guilty of this crime, the People must prove that, one, the defendant actively participated in a criminal street gang; two, when the defendant participated in the gang, he knew that members of the gang engage in or have engaged in a pattern of criminal gang activity; and three, the defendant willfully assisted, furthered, or promoted felonious criminal conduct by members of the gang, either by, A, directly and actively committing the felony offense, or B, aiding and abetting a felony offense.

"At least two members of that same gang must have participated in committing the felony offense. The defendant may count as one of those members if you find that the defendant was a member of the gang.

"Active participation means involvement with a criminal street gang in a way that is more than passive or in name only. The People do not have to prove that the defendant devoted all or a substantial part of his time or efforts to the gang or that he was an actual member of the gang."

### 1. *Forfeiture*

The People assert that defendants forfeited their challenge to CALCRIM No. 1400 by failing to object at trial. (See *People v. Guiuan* (1998) 18 Cal.4th 558, 570 [" 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' "].) Defendants claim no objection was needed because the error affected their substantial rights. (See § 1259.)

In order to forestall potential claims of ineffective assistance of counsel, we will assume that the issue was not forfeited, and we will proceed to consider the merits of defendants' argument.

16

## 2. *Standard of Review*

We review the trial court's instructions independently. (*People v. Alvarez* (1996) 14 Cal.4th 155, 217.) In doing so, we recognize " ' "that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions." [Citation.]' [Citation.] ' " 'A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant. [Citations.]' [Citation.] ' "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." ' " ' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 905 (*Covarrubias*).)

## 3. *Analysis*

Defendants contend that CALCRIM No. 1400 was internally contradictory on the facts of this case, which involved evidence that "only two individuals" committed the underlying offenses. The instruction told the jury that two gang members must have participated in the offenses, but also that the jury did not have to find that a defendant was a gang member. Defendants contend that the jury could have convicted them despite finding that one of them was not a gang member.

In telling the jury that a defendant did not have to be a gang member in order to be found guilty of violating section 186.22, subdivision (a), the instruction correctly stated the law. Section 186.22, subdivision (i) specifies that a conviction under subdivision (a) does not require the prosecution to prove "that the person is a member of the criminal street gang." (See also *Rodriguez*, *supra*, 55 Cal.4th at p. 1130 ["A person who is not a member of a gang, but who actively participates in the gang, can be guilty of violating section 186.22(a)."].)

Here, a reasonable and intelligent juror would understand that they could not convict defendants without finding them both to be gang members. A reasonable and intelligent juror would understand that the instruction was generally applicable to all

17

cases involving charges of active participation in a criminal street gang. In other words, a reasonable and intelligent juror would understand that when the instruction stated that two gang members must have participated in the underlying offense *and* that the defendant did not have to be an actual gang member, the instruction was covering cases where there were more than two people involved in the underlying offense. Defendants have failed to " ' " 'demonstrate a reasonable likelihood that any jurors understood the instruction' " ' " as not requiring them to find that both defendants were gang members at the time of the offense. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 905.)

## C.    *Ineffective Assistance of Counsel Claims*

Defendant Aguilar contends his trial counsel was ineffective for failing to object when a gang detective testified that defendant Jimenez admitted he was a Norteño during his gang registration. Defendants both contend their trial attorneys were ineffective for failing to object to the listing of various violent crimes during the expert testimony about the Norteño gang's primary activities, as well as to the trial court's recitation of those crimes in a jury instruction.

### 1.    *Legal Standard*

To establish ineffectiveness of counsel, a defendant must show that his or her counsel's representation fell below an objective standard of reasonableness and a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).)

### 2.    *Admission of Jimenez's statement*

Defendant Aguilar contends that his trial counsel should have objected when a gang detective testified that defendant Jimenez had claimed Norteño gang membership. Defendant Aguilar asserts that the admission of that out-of-court statement by defendant Jimenez, who did not testify at trial, violated his confrontation rights under the Sixth

18

Amendment pursuant to *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*) and *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).

The challenged testimony came in through the testimony of gang detective Sean Santoro. When Santoro registered defendant Jimenez in September 2017, defendant Jimenez said he was a Norteño. The trial court told the jury, pursuant to CALCRIM No. 305, that it could only consider that statement against defendant Jimenez and not against defendant Aguilar.[6]

Under *Bruton*, a non-testifying codefendant's statement that implicates the other defendant is inadmissible at a joint trial, even with a limiting instruction. (See *Bruton*, *supra*, 391 U.S. at p. 137.) *Crawford* held that the confrontation clause bars the admission of testimonial hearsay unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination. (*Crawford*, *supra*, 541 U.S. at p. 68.) *Crawford* also explained that statements made during a police interrogation constitute testimonial hearsay. (*Ibid*.)

With respect to the *Bruton* claim, the challenged statement was neither "facially incriminating" nor " 'powerfully incriminating' " of defendant Aguilar, since it neither mentioned defendant Aguilar nor implied that defendant Aguilar was an accomplice. (See *Richardson v. Marsh* (1987) 481 U.S. 200, 207.) To the extent that the statement was incriminating of defendant Aguilar when "linked with evidence introduced later at trial" (*id*. at p. 208), the trial court's limiting instruction was sufficient to protect defendant Aguilar's confrontation rights (*id*. at p. 211).

With respect to the *Crawford* claim, we agree with the People that the record is too undeveloped to determine whether the challenged statement fell within a hearsay

---

[6] The instruction provided: "You have heard evidence that Defendant Alonzo Jimenez made a statement before trial. You may consider that evidence only against him, not against Defendant Saul Aguilar."

19

exception, such as admission by a party opponent (Evid. Code, § 1220) or declaration against penal interest (Evid. Code, § 1230).

Even assuming that reasonable trial counsel would have objected to the admission of Jimenez's statement, defendant Aguilar fails to establish the prejudice prong of his claim. The evidence of both defendants' Norteño gang membership was strong; in particular, they both had prominent Norteño gang tattoos that effectively proclaimed themselves to be active Norteño gang members. There was evidence that defendant Aguilar dressed in Norteño gang clothing. The evidence established that defendants both had previously committed offenses that were among the Norteño gang's primary activities, and that they did so in the current case while they were associating with one another. On this record, defendant Aguilar fails to demonstrate there is a reasonable probability that the result of the trial would have been different if his counsel had objected to, and the trial court had excluded, the challenged statement. (See *Strickland*, *supra*, 466 U.S. at p. 687.)

*3.     References to Violent Crimes*

As noted above, the prosecution's gang expert testified that the primary activities of the Norteño criminal street gang are murder, attempted murder, assault with a deadly weapon, carjacking, illegal firearm possession, possession of a concealed firearm, and kidnapping.

The trial court subsequently instructed the jury pursuant to CALCRIM No. 1401 that "[a] criminal street gang is an ongoing organization, association, or group of three or more persons, whether formal or informal, . . . that has, as one or more of its primary activities, the commission of any of the following offenses:  Murder, Penal Code 187; assault with a deadly weapon, Penal Code 245; possession of a concealed firearm, Penal Code 25400; possession of a loaded firearm not registered to the person in a vehicle or on the person, Penal Code 29800 . . . ."

20

Defendants contend that the violent crimes listed by the gang expert and in the jury instruction had no relevance to the charged offenses and that the references to those crimes was unduly prejudicial. Defendants contend that trial counsel should have objected to the listing of crimes "that were not specific gun offenses relevant to this case" under Evidence Code section 352. Defendants contend that the references to the violent crimes invited the jury to speculate that the gun they possessed would be used for a future violent crime.

Even assuming that reasonable trial counsel would have objected to the listing of the violent crimes both by the expert and in the jury instruction, defendants have failed to demonstrate the prejudice prong of their ineffective assistance claims. The references to the violent crimes as included within the primary activities of the Norteño gang were brief. (Compare *People v. Albarran* (2007) 149 Cal.App.4th 214, 227 [gang expert testified "at length" about other gang members and the crimes they had committed].) The evidence did not include inflammatory details of any such violent crimes. (Compare *ibid.* [gang expert testimony about other gang members' threat to kill police officers].) The evidence established that the Norteño gang included thousands of members, thereby lessening the risk that the jury would speculate that defendants themselves were involved in any crimes beyond their prior and current firearm offenses. And, as previously explained, there was strong evidence supporting the gang enhancements and the gang offenses. On this record, defendants fail to demonstrate there is a reasonable probability that the result of the trial would have been different if their trial attorneys had objected to, and the trial court had excluded, the challenged gang expert testimony and jury instruction. (See *Strickland*, *supra*, 466 U.S. at p. 687.)

## D. *Cumulative Prejudice Claim*

Defendant Aguilar contends the cumulative effect of the asserted evidentiary insufficiencies, instructional error, and his trial counsel's ineffective assistance were "related errors" that deprived him of a fair trial and the ability to present a defense.

21

(See *People v. Hill* (1998) 17 Cal.4th 800, 844 ["a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error"].)

We have found no merit to the evidentiary insufficiency claims, instructional error claim, or the ineffective assistance of counsel claims. With no errors to aggregate, the cumulative prejudice claim must fail.

### E.    *Prior Conviction Claims*

Defendant Jimenez challenges the trial court's finding that he suffered a prior "strike" conviction, while defendant Aguilar asserts that the one-year prior prison term enhancement must be stricken.

#### 1.    *Jimenez's Strike*

The information alleged that defendant Jimenez had a prior juvenile adjudication that qualified as a strike: a robbery committed when defendant Jimenez was 16 years or older. Defendant Jimenez waived his right to a jury trial on the allegation and, after a court trial, the trial court found the allegation true. The documents submitted to prove the juvenile adjudication included a Welfare and Institutions Code section 602 petition and a "Juvenile Detention Disposition Report" reflecting that defendant Jimenez had admitted the robbery allegation.

At the sentencing hearing, the trial court denied defendant Jimenez's motion to strike the strike allegation (see *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497) and, pursuant to the Three Strikes law, doubled the 16-month low term for the violation of section 29800 to 32 months. (See § 667, subd. (e)(1).)

Defendant Jimenez contends that "using a juvenile adjudication procured without jury trial to increase punishment in a later proceeding violated [his] Sixth and Fourteenth Amendment rights to jury trial and proof beyond a reasonable doubt" and that "the Due Process Clause of the Fourteenth Amendment forbids the use of a prior juvenile adjudication to subsequently enhance an adult sentence."

Defendant Jimenez acknowledges that in *People v. Nguyen* (2009) 46 Cal.4th 1007 (*Nguyen*), the California Supreme Court held that juvenile adjudications may be used as strikes. In *Nguyen*, the court considered whether the United States Constitution permitted the use of a prior juvenile adjudication as a strike "even though there was no right to a jury trial in the juvenile proceeding." (*Id*. at p. 1010.) The prosecution had alleged as a strike that the defendant had suffered a prior juvenile adjudication at age 16 for assault with a deadly weapon. (*Id*. at p. 1013.) The defendant waived his right to a jury trial on that allegation, and the court found it true based on documents showing that the defendant had admitted in the juvenile proceedings that he had committed an assault with a deadly weapon. (*Ibid*.)

The California Supreme Court rejected the *Nguyen* defendant's claim that *Apprendi v. New Jersey* (2000) 530 U.S. 466 barred the use of a juvenile adjudication as a strike. The court pointed out that "the literal rule of *Apprendi* . . . required only that a jury in the current proceeding determine the existence of" the prior juvenile adjudication. (*Nguyen*, *supra*, 46 Cal.4th at p. 1015.) Since the defendant had been afforded (but waived) the right to a jury trial in the current proceeding on the question of whether he had suffered the prior juvenile adjudication, the rule of *Apprendi* had not been violated. (*Ibid*.) Nevertheless, the *Nguyen* defendant claimed that "the lack of a jury-trial right in the *prior juvenile proceeding* precludes *all use* of the resulting adjudication to enhance the maximum sentence for his current offense." (*Id*. at p. 1016.) The court disagreed. "*Apprendi* and its progeny concern an *adult's* right to jury findings, in the adult case, of all previously unadjudicated facts that bear upon the maximum sentence for the adult offense." (*Id*. at p. 1024.) Since the facts of the adult defendant's juvenile offense had been previously adjudicated in the prior juvenile proceedings, the use of the juvenile adjudication as a strike did not violate the defendant's Sixth Amendment rights. (*Ibid*.)

Defendant Jimenez claims that the California Supreme Court's decision in *Nguyen* has been fatally undermined by the United States Supreme Court's decisions in

*Descamps v. United States* (2013) 570 U.S. 254 (*Descamps*) and *Mathis v. United States* (2016) 579 U.S. __ [136 S.Ct. 2243, 2016 U.S. LEXIS 4060] (*Mathis*), and by the California Supreme Court's decision in *People v. Gallardo* (2017) 4 Cal.5th 120 (*Gallardo*). The Second District Court of Appeal rejected similar arguments in *People v. Romero* (2019) 44 Cal.App.5th 381, and, subsequent to *Descamps*, *Mathis*, and *Gallardo*, the California Supreme expressly declined to reconsider *Nguyen*. (*People v. Landry* (2016) 2 Cal.5th 52, 117, fn. 18.) As explained below, we also find the arguments regarding *Nguyen* unpersuasive.

In *Descamps*, a case concerning the requirements of a federal statute, not the scope of the Sixth Amendment right to a jury trial, the United States Supreme Court held that the statute did not permit a court to make "its own finding about" a previously unadjudicated fact concerning a prior conviction to increase a defendant's maximum sentence for a current offense. (*Descamps*, *supra*, 570 U.S. at p. 270.) One of the three reasons forming the basis for the court's statutory analysis was "avoid[ing] the Sixth Amendment concerns that would arise from sentencing courts' making findings of fact that properly belong to juries." (*Id.* at p. 267.) Consequently, the court found that the federal statute precluded the sentencing court from making factual findings beyond the elements of the prior offense. (*Id.* at p. 270.)

*Mathis* applied *Descamps* to a slightly different scenario under the same federal statute, and again concluded that a court was precluded from making factual findings beyond the elements of the prior offense. (*Mathis*, *supra*, 579 U.S. at pp. __ [136 S.Ct. at pp. 2248-2252].) The court explained again that one of the three reasons for this rule was that the Sixth Amendment required "[t]hat . . . a judge cannot go beyond identifying the crime of conviction to explore the manner in which the defendant committed that offense." (*Id.* at p. __ [136 S.Ct. at p. 2252].)

Neither *Descamps* nor *Mathis* had any impact on the analysis applied in *Nguyen*. The *Nguyen* decision held that a prior juvenile adjudication could be used as a strike

24

without violating the Sixth Amendment because its use did not require findings on any previously unadjudicated facts. Both *Descamps* and *Mathis* were concerned with the use of a prior conviction to enhance a sentence where its use required a finding on a previously unadjudicated fact. The *Nguyen* decision's reasoning was unaffected by those holdings.

In *Gallardo*, the issue was whether a trial court could properly decide, based on a preliminary hearing transcript, whether a conviction of former section 245, subdivision (a)(1) had involved an assault with a deadly weapon (which would qualify as a strike) or instead an assault by means of force likely to cause great bodily injury (which would not qualify as a strike). The statutory definition of the offense included both means of committing the offense, and the defendant had entered a guilty plea that did not specify whether she had used a deadly weapon. (*Gallardo*, *supra*, 4 Cal.5th at pp. 123-125, 136.) The trial court in *Gallardo* had reviewed the testimony of the victim at the preliminary examination in the prior case and determined that the defendant had used a deadly weapon to assault the victim in the prior case. (*Id*. at p. 126.) Based on *Descamps* and *Mathis*, the California Supreme Court held in *Gallardo* that a court may not rely on its own finding on a previously unadjudicated fact to increase the defendant's sentence without violating the Sixth Amendment. (*Id*. at pp. 132-134.)

The *Gallardo* decision too had no impact on the rationale of the *Nguyen* decision. What the *Gallardo* decision proscribed was "judicial factfinding" about a previously unadjudicated fact. (*Gallardo*, *supra*, 4 Cal.5th at p. 136.) The use of defendant Jimenez's prior juvenile adjudication as a strike did not require judicial factfinding about a previously unadjudicated fact. The pertinent facts were adjudicated in the juvenile proceedings when defendant Jimenez admitted the robbery allegation. No factfinding as to the nature of defendant Jimenez's prior offense was involved here.

Defendant Jimenez's due process argument is based on *McKeiver v. Pennsylvania* (1971) 403 U.S. 528, a plurality decision that ultimately found there is no right to a jury

25

trial in a juvenile proceeding.  (See *id*. at p. 545.)  The *McKeiver* court declined to find that juvenile proceedings should be "equated" to a criminal trial.  (*Id*. at p. 550; see *id*. at p. 553 [conc. opn. of White, J.].)  Defendant Jimenez asserts that in California, because a juvenile adjudication can be used to enhance punishment at a criminal trial, the reasoning of *McKeiver* should preclude the use of a juvenile adjudication as a strike.  Defendant Jimenez notes that the Supreme Court of Louisiana has reached that conclusion based on Louisiana's Habitual Offender Law.  (*State v. Brown* (La. 2004) 879 So. 2d 1276, 1279, 1290.)  However, "the overwhelming majority of courts" have rejected the argument.  (*Nguyen*, *supra*, 46 Cal.4th at p. 1020.)  That majority of courts includes our own California Supreme Court's decision in *Nguyen*, which we remain bound to follow.  (*Auto Equity Sales*, *Inc*. *v*. *Superior Court* (1962) 57 Cal.2d 450, 455.)  We therefore reject defendant Jimenez's due process claim.

   2.      *Aguilar's Prior Prison Term*

   Defendant Aguilar contends, and the People concede, that his one-year prior prison term enhancement should be stricken because, as amended by Senate Bill No. 136 (2019-2020 Reg. Sess.), section 667.5, subdivision (b) only applies where the prior prison term was served for a sexually violent offense.  (See Welf. & Inst. Code, § 6600, subd. (b).)  This change in law applies retroactively to all cases not yet final on the operative date of the amendment, which was January 1, 2020.  (*People v. Lopez* (2019) 42 Cal.App.5th 337, 341 (*Lopez*); see *In re Estrada* (1965) 63 Cal.2d 740, 742.)

   Here, the trial court imposed a one-year section 667.5, subdivision (b) prior prison term enhancement for a prior prison term defendant Aguilar previously served for a conviction of section 29800, subdivision (a)(1), which is not a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b).  On January 1, 2020, defendant's case was not yet final.  Therefore, as the parties agree, defendant Aguilar is entitled to the ameliorative benefit of Senate Bill No. 136's amendment to section 667.5, subdivision (b).

In *Lopez*, the court explained that a remand for resentencing is unnecessary where the trial court has imposed the maximum possible sentence, because in such cases there is "no need for the court to again exercise its sentencing discretion." (*Lopez*, *supra*, 42 Cal.App.5th at p. 342.) Here, the trial court did not impose the maximum sentence, and therefore, we will order the prior prison term enhancement stricken and remand for resentencing.

**F.** **Ability to Pay Fines and Fees**

Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), defendants contend the trial court erroneously imposed certain fees and fines without finding each defendant had an ability to pay.

*1. Proceedings Below*

The probation report prepared for defendants' sentencing hearing reflected that defendant Aguilar was 21 years old and defendant Jimenez was 22 years old. Both defendants declined to provide a social history, which would have included their employment history, information about any health problems, and more. Both defendants reported residence addresses, however.

The probation report recommended imposition of a $3,600 restitution fine as to defendant Aguilar and a $4,200 restitution fine as to defendant Jimenez. (See § 1202.4, subd. (b).) As to each defendant, the probation report recommended imposition of a $120 court facility fee (§ 1465.8, subd. (a)(1)), a $90 court operations assessment (Gov. Code, § 70373), and a $129.75 criminal justice administration fee (Gov. Code, §§ 29550, 29550.1, 29550.2) to the City of San Jose.

At the sentencing hearing held on September 21, 2018, the trial court imposed identical fees and fines for both defendants: a $500 restitution fine, a $120 court facility fee, a $90 court operations fee, and a $129.75 criminal justice administration fee to the City of San Jose. Neither defendant objected to the fees and fines.

27

## 2.    *The Dueñas Case*

The defendant in *Dueñas* was indigent, homeless, and unemployed due to a disability.  She was convicted of driving with a suspended license, placed on misdemeanor probation, and ordered to pay a $150 restitution fine, a $40 court facility fee, and a $30 court operations assessment.  (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1162.) The trial court found that the latter two fees were mandatory and that the restitution fine could only be waived if there were "compelling and extraordinary reasons" as defined by section 1202.4, subdivision (c), which excludes "inability to pay" as a basis for waiver (*ibid*.).

*Dueñas* found it unconstitutional to "us[e] the criminal process to collect" fines and fees that the defendant could not pay due to her poverty.  (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1160.)  The court held "that due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under Penal Code section 1465.8 and Government Code section 70373" and "that although Penal Code section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine."  (*Dueñas*, *supra*, at p. 1164.)

The *Dueñas* court noted that the court facility fee and the court operations assessment were intended to generate funds for courts rather than to be "punitive." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1165.)  However, that revenue goal is not furthered by imposing such fees on people who are unable to pay.  (*Id*. at p. 1167.)  Moreover, a person who cannot pay court fees can face additional consequences, such as collections actions, which the court described as "additional punishment" that, if imposed without a finding of ability to pay, would be "fundamentally unfair."  (*Id*. at p. 1168.)

28

The restitution fine, in contrast, *is* intended to be "additional punishment for a crime." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1169.) However, imposition of even a minimum fine on an indigent defendant can result in disparate treatment of indigent and wealthy probationers, because someone who can pay off the restitution fine and fulfills all the other obligations of probation can often obtain dismissal of the charges pursuant to section 1203.4. (See *Dueñas*, *supra*, at p. 1170.)

Courts of Appeal have not agreed whether *Dueñas* was correctly decided, and the issue is pending before the California Supreme Court in *People v. Kopp* (2019) 38 Cal.App.5th 47, S257844, review granted November 13, 2019. Members of this court have reached different conclusions on the issue. (See *People v. Adams* (2020) 44 Cal.App.5th 828, 831 [maj. opn]; *id*. at pp. 832-833 [dis. opn. of Premo, J.]; *People v. Petri* (2020) 45 Cal.App.5th 82, 91-92 [maj. opn]; *id*. at p. 95 [dis. opn. of Premo, J.]; *People v. Santos* (2019) 38 Cal.App.5th 923, 933 [maj. opn.]; *id*. at p. 935 [dis. opn. of Elia, J.].)

### 2.    *Forfeiture*

Defendants' sentencing occurred in 2018, prior to the 2019 *Dueñas* decision. Defendants argue that their failure to object at sentencing does not forfeit their appellate claims because the sentencing hearing predated *Dueñas*.

We need not determine whether defendants forfeited their constitutional claims based on *Dueñas*. As explained below, we find defendants forfeited their challenges to the $500 restitution fines because there was a statutory basis to object to these fines and fees based on their inability to pay that existed prior to the *Dueñas* decision. Their failure to make such an objection also implied that they were able to pay the $129.75 booking fee, the $120 court operations fee, and the $90 court facilities fee.

Under section 1202.4, subdivision (b)(1), the trial court is required to impose a restitution fine of not less than $300 and not more than $10,000. The statute provides that the trial court may not consider a defendant's ability to pay when imposing the

minimum fine of $300. (§ 1202.4, subd. (c).) However, if the court sets a restitution fine in excess of the minimum, it must consider "any relevant factors, including, but not limited to, the defendant's inability to pay . . . ." (*id*., subd. (d).)

Here, the trial court imposed restitution fines of $500 as to each defendant. Since $500 was "in excess of the minimum fine" (§ 1202.4, subd. (c)), defendants had statutory grounds to object based on an inability to pay. "[E]ven before *Dueñas* a defendant had every incentive to object to imposition of a maximum restitution fine based on inability to pay because governing law as reflected in the statute (§ 1202.4, subd. (c)) expressly permitted such a challenge." (*People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033.) "Thus, even if *Dueñas* was unforeseeable . . . , under the facts of this case [defendants] forfeited any ability-to-pay argument regarding the restitution fine by failing to object." (*Ibid*.)

In imposing the $129.75 criminal justice administration fee, the trial court referenced the three booking fee statutes: Government Code sections 29550, 29550.1, and 29550.2. The latter statute (Gov. Code, § 29550.2) includes an ability to pay requirement, so at least arguably defendants also forfeited their challenges to that fine. (See *People v. McCullough* (2013) 56 Cal.4th 589, 591 [a defendant's failure to object to imposition of a Gov. Code, § 29550.2, subd. (a) booking fee "forfeits the right to challenge it on appeal"].) Because the trial court ordered the fees payable to the City of San Jose, however, it appears that the proper statutory basis for the fee in this case was Government Code section 29550.1, which does not include an ability to pay requirement.[7]

---

[7] It is not entirely clear whether defendants are challenging imposition of the criminal justice administration fee. Defendant Aguilar mentions the criminal justice administration fee in his second supplemental opening brief, but in his reply brief he does not assert that the criminal justice administration fee should be stricken or stayed. Defendant Jimenez joined in defendant Aguilar's briefing on the issue. We will assume defendants' arguments encompass that fee.

Nevertheless, by failing to challenge the imposition of the $500 restitution fines, which were $200 above the statutory minimum, defendants effectively forfeited any argument that they had an inability to pay at least that amount. The record indicates that neither defendant was homeless, and that both were young and apparently able-bodied. Both defendants would likely be able to pay at least a portion of the fees and fines through prison wages. (See *People v. Johnson* (2019) 35 Cal.App.5th 134, 139-140; *People v. Jones* (2019) 36 Cal.App.5th 1028, 1035.) On this record, we conclude that the trial court reasonably made an implied finding that, in addition to having the ability to pay the $500 restitution fine, defendants had the ability to pay the additional $339.75— consisting of the $129.75 criminal justice administration fee, the $120 court operations assessment (§ 1465.8, subd. (a)(1)), and the $90 court facilities fee (Gov. Code, § 70373). In other words, with defendants having failed to object to the imposition of restitution fines that exceeded the minimum by $200, the trial court could reasonably infer that each defendant had the ability to pay the additional fee amounts.

## III.  DISPOSITION

As to defendant Jimenez, the judgment is affirmed. As to defendant Aguilar, the judgment is reversed and the matter is remanded with directions to strike the prior prison term enhancement (Pen. Code, § 667.5, subd. (b)) and resentence defendant Aguilar.

_____

Cogliati, J.[*]

WE CONCUR:

_____

Greenwood, P.J.

_____

Elia, J.

People v. Aguilar
H046279

_____

[*] Judge of the Santa Cruz County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.